PENTHOUSE INTERNATIONAL, LTD.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, etc.,
Defendant-Appellant.

HUSTLER MAGAZINE, INC., etc.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, etc.,
Defendant-Appellant.

HIGH SOCIETY MAGAZINE, INC.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, etc.,
Defendant-Appellant.

EASTWAY ENTERPRISES, LTD.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, etc.,
Defendant-Appellant.

MONTCALM PUBLISHING
CORPORATION,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, etc.,
Defendant-Appellant.

PENTHOUSE INTERNATIONAL, LTD.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, Individually and as Solicitor General of the County of Fulton, State of Georgia, Defendant-Appellant.

PLAYBOY ENTERPRISES, INC.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, Individually and as Solicitor General for the County of Fulton, State of Georgia, Defendant-Appellant.

PLAYBOY PUBLICATIONS, INC.,
Plaintiff-Appellee,

v.

Hinson McAULIFFE, Individually and as Solicitor General for the County of Fulton, State of Georgia, Defendant-Appellant.

Nos. 77–2951, 78–2794.

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1980.

Larry E. Parrish, Memphis, Tenn., for defendant-appellant.

Herald Price Fahringer, Paul J. Cambria, Jr., Barbara J. Davies, Buffalo, N. Y., for plaintiff-appellee.

Carl Ruderman, pro se, for High Soc. Magazine, Eastway Enterprises, Ltd. and Montcalm Publishing Corp.

Gambrell & Mobley, James L. Paul, Katharine C. Robey, Atlanta, Ga., Grutman & Schafrann, Norman R. Grutman, New York City, for Penthouse Intern., Ltd.

Smith, Cohen, Ringel, Kohler & Martin, Warren C. Fortson, David K. Whatley, Atlanta, Ga., Devoe, Shadur & Krupp, Neil H. Adelman, Chicago, Ill., for Playboy Enterprises, Inc. and Playboy Publications, Inc.

Michael A. Bamberger, New York City, for American Booksellers Assoc., Inc., The Assoc. of American Publishers Inc., et al., amici curiae.

Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.

THORNBERRY, Circuit Judge:

Penthouse International, Ltd. (Penthouse) and Hustler Magazine, Inc. (Hustler) separately filed complaints for declaratory and preliminary as well as permanent injunctive relief on July 29, 1977. Similar complaints were filed on August 2, 1977, by High Society Magazine, Inc. (High Society) and on August 4, 1977 by Eastway Enterprises Ltd. (Eros) and Montcalm Publishing Corporation (Gallery).[1] These parties sought relief against McAuliffe as an individual and in his capacity as Solicitor General for Fulton County, Georgia. The publishers sought to enjoin McAuliffe's activities which culminated in prosecutions of individuals who sold the complainants' magazines for alleged violations of Georgia

---

1. Each of the appellees involved in this case is in the business of publishing magazines.

Code § 26–2101,[2] which prohibits the distribution of obscene materials. Complainants sought relief in their capacity as publishers of the magazines because their income is derived from the sale of magazines to a primary local distributor and several local retailers. These individuals were being arrested by McAuliffe and they refused to continue selling complainants' magazines. The substantive claims of the complainants arise under the First and Fourteenth Amendments to the United States Constitution.

The complaint of each publisher alleged in essence that McAuliffe had embarked on an intentional course of conduct that resulted in the termination of sales of the August 1977 issues of their respective magazines in Fulton County, Georgia. This was allegedly accomplished through a program of bad faith and harassment including arrests of several retailers. The complainants sought a temporary restraining order against future arrests for alleged violations of the Georgia statute as well as against other intimidating conduct on the part of McAuliffe. They also sought preliminary and permanent injunctive relief. In addition, complainants sought a declaration that the August 1977 issues of their respective magazines were not obscene.

All of the complainants' cases were consolidated for purposes of discovery as were the applications for preliminary and permanent injunctions. On August 15 and 16, 1977, Judge Freeman conducted an evidentiary hearing resulting in the issuance of an order on August 25, 1977. This order permanently enjoined McAuliffe from making further arrests under Georgia Code § 26–

---

2. Ga.Code § 26–2101—Distributing obscene materials

(a) A person commits the offense of distributing obscene materials when he sells, lends, rents, leases, gives, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or offers to do so, or possesses such material with the intent to do so, provided that the word "knowing," as used herein, shall be deemed to be either actual or constructive knowledge of the obscene contents of the subject matter, and a person has constructive knowledge of the obscene contents if he has knowledge of facts which would put a reasonable and prudent person on notice as to the suspect nature of the material. Provided, however, the character and reputation of the individual charged with an offense under this law, and if a commercial dissemination of obscene material is involved, the character and reputation of the business establishment involved may be placed in evidence by the defendant on the question of intent to violate this law. Undeveloped photographs, molds, printing plates and the like shall be deemed obscene notwithstanding that processing or other acts may be required to make the obscenity patent or to disseminate it.

(b) Material is obscene if:

(1) to the average person, applying contemporary community standards, taken as a whole, it predominantly appeals to the prurient interest, that is a shameful or morbid interest in nudity, sex or excretion;

(2) the material taken as a whole, lacks serious literary, artistic, political or scientific value, and

(3) the material depicts or describes, in a patently offensive way, sexual conduct specifically defined in subparagraphs (i) through (v) below:

(i) acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(ii) acts of masturbation;

(iii) acts involving excretory functions or lewd exhibition of the genitals;

(iv) acts of bestiality or the fondling of sex organs of animals;

(v) sexual acts of flagellation, torture or other violence indicating a sadomasochistic sexual relationship;

(c) Additionally, any device designed or marketed as useful primarily for the stimulation of human genital organs is obscene material under this section.

(d) Material, not otherwise obscene, may be obscene under this section if the distribution thereof, or the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.

(e) It is an affirmative defense under this section that dissemination of the material was restricted to:

(1) a person associated with an institution of higher learning, either as a member of the faculty or a matriculated student, teaching or pursuing a course of study related to such material; or

(2) a person whose receipt of such material was authorized in writing by a licensed medical practitioner or psychiatrist.

2101 for the sale of the August issues of the publications in question without first obtaining an arrest warrant. Judge Freeman also declared that McAuliffe's enforcement activities under color of Georgia law, "consisting of numerous and harassing arrests with or without a warrant prior to a final adjudication upon the issue of obscenity *vel non* at an adversary hearing constitutes a prior restraint violative of the First and Fourteenth Amendments of the United States Constitution." *Penthouse International, Ltd. v. McAuliffe,* 436 F.Supp. 1241, 1256 (N.D.Ga.1977). Judge Freeman also declared that the August 1977 issue of "Penthouse" was not obscene within the meaning of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and the Georgia statute.

A second set of complaints was filed by Penthouse on December 9, 1977, and by Playboy Enterprises, Inc. and Playboy Publications, Inc. (Playboy) on December 14, 1977, against McAuliffe, individually and in his capacity as Solicitor General. These complaints sought declaratory and injunctive relief regarding the January 1978 issues of "Penthouse," "Playboy," and "Oui" magazines. The complaints alleged bad faith conduct on the part of McAuliffe in violation of Judge Freeman's earlier order dated August 25, 1977, and sought a declaration that the magazines in question were not obscene. Judge Freeman only granted declaratory relief in this case consisting of statements that the magazines in question were not obscene within the meaning of *Miller* and that McAuliffe must apply the Georgia statute so as to consider the magazines "as a whole."

Before evaluating the propriety of Judge Freeman's findings, an examination of the surrounding factual circumstances is warranted. In 1976, McAuliffe, as Solicitor General of Fulton County, Georgia, initiated a program in which action was taken against Atlanta's "yellow front" adult bookstores. Between January 1977 and August 1977, his office was responsible for bringing between fifteen and twenty obscenity cases to trial seeking convictions for the sale of hard-core materials in adult bookstores.

For some time before the arrests involved in this case, McAuliffe had received complaints that "obscene" materials were being vended at the airport newsstands. The magazines complained of were "Hustler," "High Society," "Oui," "Genesis" and "Playboy." In July of 1977, McAuliffe decided, as a result of his conclusion that his earlier prosecutions were having an insufficient deterrent effect, that his office would expand the scope of its actions by prosecuting for the sale of magazines deemed to be obscene, even though they were sold in convenience food stores and drug stores. McAuliffe determined that he would institute investigations which he expected would result in numerous arrests in various sections of Fulton County, Georgia. Two separate teams of investigators were dispatched to the north and south sides of Atlanta. A procedure was adopted whereby the investigators would usually identify themselves upon entering a retail establishment. They would then usually purchase a magazine and examine its contents. If the magazine was determined to be obscene, the retailer was asked if he was aware of the magazine's contents. If the retailer said yes, he was arrested without a warrant. If the retailer said no, the officers would return the next day to see if the magazines were still being displayed. If the magazines were still being displayed on the second trip, the retailer was then arrested. At no time did the investigators possess specific instructions concerning particularly named or identified issues of particular magazines. No written guidelines were provided for interpreting or enforcing the Georgia statute nor were any written instructions provided to the investigators. Neither McAuliffe nor his principal prosecutor reviewed in advance the particular magazines which served as the basis for the arrests. The investigators essentially possessed sole discretion for determining whether the Georgia statute was being vio-

lated. The only limitation was that they were required to establish that any offensive pictorial material appearing in a publication was in no way related to written material which might appear in the same publication.

McAuliffe began making arrests on July 18, 1977, and continued to do so until July 29, 1977, when Judge Freeman granted the complainants a temporary restraining order. On July 18, 1977, the investigators went to the Atlanta airport and arrested without a warrant Troy Poss, manager of the airport newsstand for selling "Penthouse," "Hustler," "Genesis," and "Oui," claiming a violation of the Georgia obscenity statute. While Mr. Poss was arrested for the sale of all four magazines, the investigator merely reviewed "Hustler" for about thirty minutes and the other three magazines for a total of five minutes before making the arrest. On the same day, Mr. Sidney Gordon was arrested without a warrant at Mill's Discount drugs for selling "Hustler." On the next day, Mr. Asa Hall was arrested without a warrant at the Nifty Food Mart for selling "High Society," "Genesis," and "Oui." On that date, articles appeared in the Atlanta Constitution and the Atlanta Journal describing the arrest of Mr. Poss and including statements from McAuliffe which indicated that more arrests would be made and that all those involved in the sale and distribution of "obscene" materials would go to jail. On July 21, 1977, Edward Elson, President of Atlanta News Agency, Inc., was arrested on a multicount accusation for the sale of various magazines published by some of the complainants.

On July 27, 1977, another article appeared in the Atlanta Constitution in which McAuliffe stated that his plan was obviously working because his men were not finding any additional violations. This could be explained by an action taken by Atlanta News Agency, Inc., the wholesale distributor of essentially all of these magazines. The company called all of its retailers and advised them to remove the magazines in question from their shelves. The second article, in addition to quoting McAuliffe, went on to state that it had found two newsstands still vending the publications. By nightfall, the proprietors of both newsstands had been arrested without a warrant. The article also stated that McAuliffe indicated he would start charging the owners as well as the employees who were selling the magazines in question. A final arrest was made without a warrant on July 29, 1977, at the Brothers III Package and Grocery Store. In addition to the arrests identified above, McAuliffe's investigators often made their presence known to other retailers throughout Fulton County.

In the second case, involving the January 1978 issues of "Playboy," "Penthouse," and "Oui," the prior restraint issue is not properly presented because the magazines were actually vended in Fulton County pursuant to an agreement with McAuliffe and because the allegedly unconstitutional procedures were never applied to the January issues of the magazines. Therefore the only issue in the second case is whether Judge Freeman correctly found that the magazines were not obscene within the meaning of *Miller* and the proper application of the "taken as a whole" test.

## PRIOR RESTRAINT

McAuliffe contends that Judge Freeman incorrectly found that the actions of his investigators created an informal system of prior restraint in violation of the First and Fourteenth Amendments to the United States Constitution. He first relies on the general principle that a police officer may make a warrantless arrest when he views a crime being committed in his presence. McAuliffe claims that his investigators had sufficient expertise to determine that the Georgia obscenity statute was being violated thus giving them probable cause to make a warrantless arrest. But even if the arrests were improperly made without a warrant, McAuliffe claims he did not "seize"

anything since the retailers and wholesalers "voluntarily" withdrew the publications from their shelves. Therefore, he states that no "constructive seizure" occurred that could result in a prior restraint and there was thus no constitutional violation.

### A. Warrantless Arrests.

■ McAuliffe initially contends that the warrantless arrests were proper because his officers viewed a violation of the Georgia obscenity statute in their presence. He relies on Georgia Code § 27–207 which provides that "[a]n arrest for a crime may be made by an officer . . . without a warrant if the offense is committed in his presence." The problem with appellant's claim is that the ability to make a warrantless arrest for an offense committed in the officer's presence contemplates the officer's ability to determine that an offense has actually been committed. Appellant is attempting to apply a statute normally appropriate for the case of a fleeing robber to items presumptively protected by the First Amendment. Appellant is incorrect in his belief that he or his agents may properly make the initial determination concerning the obscenity of a publication and that he may make a warrantless arrest if he determines that the subject matter of a publication is obscene.

McAuliffe was attempting to control items that are presumptively protected material because of the language of the First Amendment. *Maquin v. Miller,* 433 F.Supp. 223 (D.Kan.1977); *Sooner State News Agency, Inc. v. Fallis,* 367 F.Supp. 523 (N.D. Okl.1973); *Cinema Classics Limited v. Busch,* 339 F.Supp. 43 (C.D.Cal.), *aff'd,* 409 U.S. 807, 93 S.Ct. 105, 34 L.Ed.2d 66 (1972). Therefore, a retailer or distributor of presumptively protected material must be afforded greater procedural safeguards before a seizure or "constructive seizure" may take place. *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). These safeguards acquire an even greater importance because of the fine line that

must be drawn between material that is literary and material that is "obscene." Justice Brennan stated "it is clear that as long as the *Miller* test remains in effect, 'one cannot say with certainty that material is obscene until at least five members of this Court, applying inevitably obscure standards, have pronounced it so.'" *Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (Brennan, J., concurring). While Justice Brennan's statement is of course an exaggeration of the procedure required before a publication becomes subject to seizure because of its obscenity, it indicates the difficulty in applying the *Miller* test. We find that McAuliffe's investigators, possessing no written instructions or written guidelines, could not determine whether or not the magazines were obscene in light of the difficult test adopted by the Supreme Court in *Miller. See In re Louisiana News Company,* 187 F.Supp. 241 (E.D. La.1960). There must be some judicial determination of obscenity *before* a seizure or "constructive seizure" may occur. *United States v. Hunt,* 496 F.2d 888 (5 Cir. 1974). Therefore, McAuliffe may not rely on Georgia Code § 27–207 because his investigators were not able to determine whether an offense had been committed in their presence. As was the case with the arrest of Troy Poss, proprietor of a magazine stand at the Atlanta airport, an examination of four magazines by McAuliffe's investigators for a total of thirty-five minutes is not sufficient to justify a warrantless arrest. The only question remaining is, assuming the existence of a constructive seizure that creates a system of informal prior restraint, did a judicial determination of obscenity occur at a proper time to comport with minimum constitutional requirements.

### B. Informal System of Prior Restraint.

■ We must first determine whether the district court correctly found that McAuliffe created an informal system of prior restraint. McAuliffe claims that the district court must have erred because he

did not actually "seize" anything. He claims that the retailers and distributors voluntarily removed the publications in question from their shelves. This view ignores the substance of the actions taken by McAuliffe and his investigators. Courts must look through the form to the substance when examining whether a system of informal prior restraint has been created. *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Allied Artists Picture Corp. v. Alford,* 410 F.Supp. 1348 (W.D.Tenn.1976).

We are not the first court to look past the form of a transaction and examine its substance. Threats of prosecution or of license revocations on the part of prosecutors have been enjoined in several cases. The Supreme Court in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), examined a situation where the Rhode Island Legislature had created the "Rhode Island Commission to Encourage Morality in Youth" for the nominal purpose of informing the public about publications containing "obscene, indecent or impure language." The Commission's practice was to notify a distributor that it had reviewed certain books or magazines which he distributed and that a majority of the Commission believed that the publication was objectionable for distribution to youthful readers. The reaction of the distributors after receiving a notice would often be to stop further circulation of the listed publication to retailers in Rhode Island and to visit the retailers for the purpose of retrieving the unsold copies. After the notice had been received, a local police officer would often visit a distributor to determine what action had been taken. The Supreme Court held that this scheme adopted by the Rhode Island Commission violated the Fourteenth Amendment. The distributors and retailers, by reason of intimidation and the threat of prosecution, were forced to cease selling the "suspect" publications. The Supreme Court found that even though the distributors would violate no law if they refused to cooperate with the Commission,

compliance with the directives was *not voluntary.* The scheme was described as a "system of prior administrative restraints" operating without judicial supervision. Not only was there no provision for judicial superintendence before the notices were issued, but there was also no judicial review of the Commission's determinations. In addition, a distributor was not entitled to notice and hearing before the publications were listed as objectionable.

The procedure adopted and enforced by McAuliffe and his office resembles the procedure scrutinized in *Bantam Books.* McAuliffe, with the use of a calculated scheme that included public announcements in the local newspapers, systematic visits to retailers of the magazines in question, and a program of carefully timed warrantless arrests, effected a "constructive seizure" of the complainant's publications without first allowing a neutral, detached magistrate to make an independent judicial determination of the propriety of the seizure. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Prescott,* 599 F.2d 103 (5 Cir. 1979).

It cannot be said that the retailers of the magazines in question "voluntarily" removed the magazines from their shelves. As in *Bantam Books,* the procedure adopted by McAuliffe was a "constructive seizure" and constituted a prior restraint. McAuliffe initiated his scheme on July 18, 1977, by making two arrests. This was followed by a third arrest on the next day as well as statements by McAuliffe printed in an Atlanta paper making it clear to all retailers selling the suspect magazines that they would be arrested. The most significant arrest occurred on July 21, 1977, when Mr. Edward Elson, President of Atlanta News Agency, Inc., was arrested for the sale of eight enumerated magazines. Atlanta News Agency, Inc. serviced approximately 90% of the approximately 1,000 retail outlets in Fulton County, Georgia. After Mr. Elson's arrest, Atlanta News Agency, Inc. refused to sell the magazines involved in

this appeal and warned its retailers of the danger of doing so. There were no further arrests until July 27, 1977, presumably because there were no further violations. On this day, an Atlanta newspaper reported that its investigation revealed that McAuliffe's actions were almost completely effective in driving the suspect publications from the newsstands of Fulton County. It reported of two newsstands still vending the magazines in question but the proprietors of both stands were arrested before nightfall of the day the article was printed. In addition to the arrests, McAuliffe's investigators made visits to other establishments to assure that the magazines had been removed from the shelves. Because McAuliffe's activities constituted a calculated scheme of warrantless arrests and harassing visits to retailers, we must conclude that the *substance* of the procedures resulted in a "constructive seizure" of the magazines from the shelves of the Fulton County retail establishments and created an informal system of prior restraint. *Cf. Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *compare Wood v. State,* 144 Ga.App. 236, 240 S.E.2d 743 (1977) (warrantless arrest of individual who sold two obscene magazines to policeman did not constitute a seizure or prior restraint because the arrest was not part of a calculated scheme resulting in a constructive seizure) *with Hall v. State,* 139 Ga.App. 488, 229 S.E.2d 12 (1976) (actual seizure of film pursuant to warrantless arrest constituted unconstitutional prior restraint).

## C. Unconstitutional Prior Restraint.

■ The final question requires a determination whether the district court correctly found that the informal system of prior restraint was proscribed by the First and Fourteenth Amendments to the United States Constitution. We must initially note that there is a strong presumption against the constitutional validity of a system of prior restraint. *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140,

29 L.Ed.2d 822 (1971); *Bantam Books, supra; Near v. 'Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930); *International Society for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809 (5 Cir. 1979). When dealing in the area of presumptively protected material, greater procedural safeguards must be afforded before the occurrence of a "constructive seizure." This usually involves the requirement of a judicial determination of some type by a neutral, detached magistrate either before or immediately after the seizure of allegedly obscene material.

■ The Supreme Court decided two cases on the same day that essentially established the minimum constitutional requirements for determining when a seizure of allegedly obscene materials constitutes an unconstitutional prior restraint. *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973); *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). In *Heller,* a judge of the New York Criminal Court, after viewing a film in its entirety, signed a search warrant for the seizure of the film and three arrest warrants because he believed that the film was obscene. No one at the theatre was notified or consulted prior to the issuance of the warrants and the film was seized without a prior adversary hearing. The Supreme Court upheld this procedure since the film was examined by a neutral, detached magistrate who had a full opportunity for an independent judicial determination of probable cause prior to issuing the warrant. The film was declared obscene following an adversary trial occurring within 48 days after the temporary seizure of the film. This procedure was approved because a seizure of one film to be used as evidence does not constitute a final restraint but merely a temporary seizure. In *Roaden,* a film which was being exhibited was also temporarily seized as evidence but without the authority of a constitutionally sufficient warrant. The Supreme Court found that, in light of the absence of a prior determina-

tion by a judicial officer on the question of obscenity, the seizure of the film created a form of prior restraint that rendered the seizure unreasonable under the Fourth Amendment to the United States Constitution. Taken together, *Heller* and *Roaden* establish the *minimum* constitutional requirement for a seizure of allegedly obscene materials. The Constitution at a minimum apparently requires the imposition of a neutral, detached magistrate in the procedure to make an independent judicial determination of probable cause prior to issuing an arrest warrant or some other warrant authorizing the seizure of allegedly obscene material to be used as evidence. *See Lee Art Theatre, Inc. v. Virginia,* 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968).

■ But the procedure adopted and enforced by McAuliffe was much more dramatic and devastating than the mere seizure of one film to be used as evidence. Instead, it resulted in the "constructive seizure" of every magazine in Fulton County, Georgia, that McAuliffe deemed to be obscene. The arrests effectuating this "constructive seizure" were made without warrants and the issue of obscenity was never examined by a neutral, detached magistrate. While the Supreme Court has indicated that a complete judicial adversary hearing may be required before or shortly after initiating a series of warrantless arrests that have the obvious effect of seizing presumptively protected materials, we need not go this far. *See McKinney v. Alabama,* 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *A Quantity of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); *Marcus v. Property Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). *See also Classics, Ltd. v. Busch,* 339 F.Supp. 43 (C.D.Cal.) *aff'd,* 409 U.S. 807, 93 S.Ct. 105, 34 L.Ed.2d 66 (1972); *Universal Amusement Co., Inc. v. Vance,* 587 F.2d 159, 169–72 (5 Cir. 1979) (en banc); *cf. G.I. Distributors, Inc. v. Murphy,* 490 F.2d 1167 (2d

Cir. 1973), *cert. denied,* 416 U.S. 939, 94 S.Ct. 1941, 40 L.Ed.2d 290 (1974). It is enough to note that the procedure adopted by McAuliffe, including a series of warrantless arrests, does not comport with the minimum constitutional requirements enumerated in *Heller* and *Roaden.* Therefore, we conclude that the district court did not err in concluding that McAuliffe's enforcement activities of numerous and harassing arrests prior to a final adjudication upon the issue of obscenity *vel non* subjected the August issues of the magazines in question to an informal system of prior restraint in violation of the First and Fourteenth Amendments. Injunctive and declaratory relief directed against this system is appropriate. Based on this finding, we need not reach the issue of whether the magazines seized in July and August of 1977 were actually obscene. *Korioth v. Briscoe,* 523 F.2d 1271, 1274–75 (5 Cir. 1975).

## OBSCENITY VEL NON

The second case, involving only the January 1978 issues of "Penthouse," "Playboy," and "Oui," requires an examination of the three magazines to determine whether they are obscene. The Supreme Court established basic guidelines governing such a determination in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and applied these guidelines in four other cases decided on the same day. *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); *United States v. 12 200–Ft. Reels of Super 8 mm. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973). In *Miller,* the Supreme Court rejected the idea of applying a uniform national standard to determine what appeals to the prurient interest and what is patently offensive in favor of a three-prong test which examines:

(a) whether "the average person, applying contemporary community standards"

would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615. This test applies to state as well as federal legislation. *See United States v. Orito,* 413 U.S. at 145, 93 S.Ct. 2674.

When examining a publication to determine whether it is obscene, it is significant to remember that the *Miller* test is conjunctive so every element of the test must be met before a publication may be adjudicated obscene. In this case, we will adhere to the format adopted by our decision in *United States v. Thevis,* 484 F.2d 1149 (5 Cir. 1972), in which we used a chart to demonstrate whether each separate magazine met each prong of the *Miller* test.

The first and second prongs of the *Miller* test apply contemporary community standards to questions of fact such as "appeal to the prurient interest" and "patent offensiveness." *Smith v. United States,* 431 U.S. 291, 300–01, 97 S.Ct. 1756, 1763, 52 L.Ed.2d 324, 334–35 (1977). Contemporary community standards are not applied in the third prong of the *Miller* test. *Id.* While these questions are normally presented to a jury, a judge may act as a finder of fact in civil proceedings involving obscenity. *Alexander v. Virginia,* 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973); *Star v. Preller,* 375 F.Supp. 1093 (C.D.Md.), *aff'd,* 419 U.S. 956, 95 S.Ct. 217, 42 L.Ed.2d 173 (1974); *United Artists Corp. v. Harris,* 363 F.Supp. 857 (W.D.Okl.1973). The finder of fact is entitled to draw on his own knowledge of the views of the average person in the community from which he comes for making the necessary determination in a manner similar to the "reasonable" person test found in other areas of the law. *Stone v. New York, C. & St.L.R.Co.,* 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441 (1953); *Schulz v. Pennsylvania R. Co.,* 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956). The impact of the material is to be judged by its impact on an average person as opposed to a particularly sensitive or insensitive person.

The fact finder is limited though in that he clearly does not possess unbridled discretion in determining what is patently offensive sexual conduct or what lacks serious value. The Court in *Miller* noted that First Amendment values applicable to the states are protected by powers vested in the appellate courts to make an independent review of constitutional claims. 413 U.S. at 25, 93 S.Ct. 2607. In a concurring opinion, Justice Brennan spoke of the extent of the power of independent review in obscenity cases when he stated:

After the Court's decision today, there can be no doubt that *Miller* requires appellate courts—including this Court—to review independently the constitutional fact of obscenity. Moreover, the Court's task is not limited to reviewing a jury finding under part (c) of the *Miller* test that "the work, taken as a whole, lack[ed] serious literary, artistic, political, or scientific value." *Miller* also requires independent review of a jury's determination under part (b) of the *Miller* test that "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law."

*Jenkins v. Georgia,* 418 U.S. 153, 163–64, 94 S.Ct. 2750, 2756, 41 L.Ed.2d 642 (1974) (Brennan, J., concurring) (citation omitted.)

The first prong examines whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest. This test was first formulated in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1958), where the Court adopted the definition of prurient interest stated in the A.L.I. Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), of "a shameful or morbid interest in nudity, sex, or excretion." 354 U.S. at 487,

n. 20, 77 S.Ct. at 1310, n. 20. As stated above, this test is for the most part a factual question to be examined by the fact finder. Judge Freeman, in his Order of July 7, 1978, stated "that each magazine individually taken as a whole does not encourage a shameful or morbid, rather than a healthy interest in sex" and therefore does not appeal to the prurient interest. *Penthouse International, Ltd. v. McAuliffe,* 454 F.Supp. 289 (N.D.Ga.1978).

■ A question arises though in determining the proper standard of review we are to apply when evaluating Judge Freeman's finding. The question of appeal to the "prurient interest" is essentially a question of fact, indicating that Judge Freeman's finding will only be reversed if clearly erroneous. But the Supreme Court in *Miller* stated that "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary." 413 U.S. at 25, 93 S.Ct. at 2615. *Miller* requires appellate courts "to review independently the constitutional fact of obscenity." *Jenkins v. Georgia,* 418 U.S. at 163, 94 S.Ct. at 2756 (Brennan, J., concurring). The problem is that in an attempt to clarify these statements, the Supreme Court has only specifically stated that the concept of independent review applies to the second and third prongs of the *Miller* test without explicitly claiming that it also governs the first prong. Under the test applied prior to *Miller*,[3] it was obvious that independent review applied to the first prong because the issue of whether the "dominant theme" of a work appealed to the prurient interest presented a clear question of constitutional fact. *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972). Despite the Supreme Court's removal of the "dominant theme" portion

of the first prong in *Miller,* we note that the first prong retains some aspects subject to independent review in that contemporary community standards "must leave room for some latitude of judgment" and because there is an undeniable subjective element in the test as a whole. *Id.* at 232, 92 S.Ct. at 2247. We therefore find that the Supreme Court has impliedly retained in the appellate courts the power to independently review a finding made under the first prong of the *Miller* test. *See Smith v. United States,* 97 S.Ct. at 1763–64; *Jenkins v. Georgia,* 418 U.S. at 160, 163–64, 94 S.Ct. 2750; *Miller v. California,* 413 U.S. at 25, 93 S.Ct. 2607; *Kois v. Wisconsin,* 407 U.S. at 232, 92 S.Ct. 2245. We find additional support for this finding from our opinion in *United States v. Thevis,* 484 F.2d 1149 (5 Cir. 1973), where, in a chart examining twelve allegedly obscene magazines, we apparently made an independent determination that all three prongs of the *Miller* test either were or were not satisfied.

■ We realize that Judge Freeman, as a member of the community of Fulton County, Georgia, is probably able to determine whether the average person, applying contemporary community standards would find that a work taken as a whole appeals to the prurient interest. But in this case, we must exercise our power of independent review and declare that taken as a whole, "Penthouse" and "Oui" appeal to the prurient interest. When taking either magazine as a whole, a combination of the pictorial depictions as well as several items, consisting of unsolicited letters and comments giving an in-depth description of sexual conduct, can be said to appeal to a shameful interest in sex. Therefore, "Penthouse" and "Oui" satisfy the first prong of the *Miller* test. Judge Freeman was correct with respect to his finding as to "Playboy." This conclusion is represented in Table I, *infra.*

■ The second prong examines whether the work depicts or describes sexual con-

---

**3.** In *Roth* the Court stated the test as follows: "whether to the average person, applying contemporary community standards, the *dominant*

*theme* of the material taken as a whole appeals to prurient interest." 354 U.S. at 489, 77 S.Ct. at 1311 (emphasis added).

duct specifically defined by the applicable state law in a manner that the fact finder would say that the average person, applying contemporary community standards would find patently offensive. This prong therefore involves both a substantive component and an objective component. *Smith v. United States,* 97 S.Ct. at 1764. The substantive component examines what constitutes "hard core" sexual conduct as defined by the state statute. The Court in *Miller* gave several examples of what a state statute could define for regulation. This included "[p]atently offensive representations or descriptions of the ultimate sexual acts, normal or perverted, actual or simulated" as well as "[p]atently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." Taking its cue from the Supreme Court, the Georgia legislature defines sexual conduct to include:

(i) acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(ii) acts of masturbation;

(iii) acts involving excretory functions or lewd exhibition of the genitals;

(iv) acts of bestiality or the fondling of sex organs of animals;

(v) sexual acts of flagellation, torture or other violence indicating a sadomasochistic sexual relationship;

Ga.Code § 26–2101(b)(3). An examination of the January 1978 issues of Playboy, Penthouse, and Oui reveals that the only sexual conduct arguably *depicted* was the "lewd exhibition of the genitals." A distinction must be made between an act involving an exhibition of the genitals that is lewd and an exhibition that is not lewd. *Jenkins v. Georgia,* 418 U.S. at 161, 94 S.Ct. 2750. Nudity alone is not obscene. *Id.* The pictorial portions of the magazines in question in all but one case appeared as singles (showing only one person). The pictures in question consist of color photographs of young women either largely or totally undressed, exposing various portions of their bodies. The models were not engaged in concerted sexual *acts* with partners but several pictures in "Penthouse" showed the touching of the genitals. In the photographic material in "Penthouse" entitled "Tender Loving Carrie," two photographs are included in which the naked woman has her finger inserted into the lips of her genitals, so that it contacts her clitoris, her eyes closed, her mouth open, and an expression consistent with masturbation on her face. This certainly constitutes a depiction of sexual conduct under Georgia law since § 26–2101(b)(3) includes depictions of "acts of masturbation." Judge Freeman appears correct in his determination that the material in each magazine except "Penthouse" does not *depict* sexual conduct. It is difficult to argue that the other pictorial presentations *depict* acts involving the lewd exhibition of genitals.

The difficult portion of the test requires an examination of the meaning of the phrase "or describes sexual conduct." Taken literally, this connotes *verbal* description. If such is the case, all three magazines "describe sexual conduct." In "Playboy," an article entitled "Take My Wife—Please" describes acts of sexual intercourse. In "Oui," two features entitled "Sex Tapes" and "Sex Tape Letters" consist of a detailed description of acts of sexual intercourse and acts of masturbation. The same can be said of items in "Penthouse" entitled "Penthouse Forum," "Call Me Madam," "Couples," and an article entitled "The Skins of Peggy." In most cases, the description is in the form of letters from the magazines' readers describing their sexual experiences or sexual fantasies. While the focus in recent obscenity cases has virtually always revolved around pictorial presentations, it cannot be said that the literal meaning of "describes sexual conduct" should be ignored. Therefore, the magazines in question arguably satisfy the substantive component.

But even if the material depicts or *describes* sexual conduct as defined in the

Georgia statute, the objective portion of the test states that this must be done in a "patently offensive" way. Judge Freeman, as the fact finder, made a determination that the material in each magazine is "not patently offensive because it rarely depicts conduct or 'acts.'" *Penthouse International, Ltd. v. McAuliffe*, 454 F.Supp. at 303. As stated above, the fact finder does not have unbridled discretion in the determination of what constitutes patently offensive material. This is a matter subject to our independent review. *Smith v. United States*, 97 S.Ct. 1763–64. With respect to the "depiction" issue, Judge Freeman correctly determined that "Oui" and "Playboy" did not depict sexual conduct. The Georgia statute speaks of depicting "acts." Such was only found in "Penthouse," and in that case it was patently offensive. A problem arises in that Judge Freeman apparently did not address the issue of whether the magazines "describe sexual conduct" in a patently offensive way.

In "Playboy," the only arguably offensive description of sexual conduct was found in four paragraphs of a seven page article by Dan Greenburg entitled "Take My Wife—Please." The article was well written and not patently offensive.

The issue is much closer in the case of "Oui" and "Penthouse." For the most part, this occurs not because of the articles appearing in the respective magazines but due to certain segments of the publication in which surveys and unsolicited letters are printed describing sexual experiences in detail. In "Penthouse," the patently offensive descriptions of sexual conduct are found in the items mentioned above entitled "Penthouse Forum," "Call Me Madam," "Couples," and "The Skins of Peggy." In "Oui," they are entitled "Sex Tapes" and "Sex Tape Letters." Included in both magazines are in-depth descriptions of acts of sexual intercourse, heterosexual and homosexual, normal and perverted, acts of masturbation, cunnilingus, fellatio, and acts involving lewd exhibition of the genitals.

Each of these items not only describes "hard core" sexual conduct but does so in such a manner that exceeds the customary limits of good taste usually found in literature. The explicitness and amount of detail coupled with the offensive language used to describe the actual sexual experiences or sexual fantasies were presented in such a manner that was patently offensive. Except for the one article ("Skins of Peggy"), the patently offensive material is not written by the authors of the respective magazines but consists of letters or comments written by the readers of the magazines. But the publishers chose to incorporate this material into their publications so they must suffer the consequences. These items have no place in a magazine that otherwise could be said to possess literary merit.

While we realize that Judge Freeman, as a member of the community, should possess insight as to what the average person of Fulton County, Georgia, applying contemporary community standards would find patently offensive, we must exercise our power of independent view. This is especially important because Judge Freeman may have not examined the question of "describing sexual conduct." We therefore conclude that the district court incorrectly determined that "Penthouse" and "Oui" do not include patently offensive depictions or descriptions of sexual conduct. *See* Table I, *infra.*

■ The third prong of the *Miller* test examines "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." This replaced the "utterly without redeeming social value" test of *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). While appellant concedes that the January 1978 issues of "Playboy," "Penthouse," and "Oui" contain articles possessing serious value, controversy exists over the meaning of a "work, taken as a whole." Appellant initially contends that a magazine is not a "work" but a "volume" composed of many "works." Therefore, appellant would view

each separate article and pictorial presentation, to determine whether each "work" in a "volume" is obscene under the *Miller* test. We conclude that decisions of both the Supreme Court and this court require us to treat each magazine as a separate work that is to be taken as a whole.

The basic guidelines for judging obscenity have significantly changed since their initial formulation in *Regina v. Hicklin,* L.R. 3, Q.B. 360 (1868). In *Regina,* the court determined that material could be judged as obscene by viewing only isolated excerpts of a publication and the effect these excerpts had upon particularly susceptible persons. This test was adopted by some American courts but later decisions have rejected it. *United States v. One Book Entitled Ulysses,* 72 F.2d 705 (2d Cir. 1934) (rejected test when government attempted to prevent circulation of James Joyce's *Ulysses* in the United States). In *Ulysses,* Judge Augustus Hand found some parts of the book to be obscene but stated that it was not obscene when "taken as a whole." The Supreme Court specifically rejected the segmented approach of *Regina* in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). In holding that the material alleged to be obscene in *Roth* must be considered as a whole, the Supreme Court specifically approved the following instruction:

> The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion.

354 U.S. at 490, 77 S.Ct. at 1312. The first and third prongs of the *Miller* test adopt essentially the same language by stating that the "work, taken as a whole" must "appeal to the prurient interest" and lack

"serious literary, artistic, political, or scientific value."

The crucial issue requires a determination of the meaning of "work, taken as a whole" when applied to magazines. The test is easily applied to books and films but appellant argues that a magazine is merely a publication containing several unrelated pieces connected only by a central approach. Appellant therefore contends that each article and pictorial presentation is a "work" and a magazine is merely a conglomeration of these works resulting in a "volume." We cannot agree with appellant's contention.

While there has been no significant authority since *Miller* applying the "taken as a whole" test to magazines, the critical date to examine is 1957 when the Supreme Court first rejected the isolated excerpt approach in *Roth.* Since that time, the Supreme Court has examined several magazines resulting in a determination that, "taken as a whole," they were either obscene or not obscene. The first opportunity arose in *Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), where the Postmaster General withheld delivery of 405 copies of three magazines on the grounds that the magazines violated the federal obscenity statute. After an evidentiary hearing before the Judicial Officer of the Post Office Department, there ensued an administrative hearing where the magazines were found to be obscene. The District Court and Court of Appeals agreed that the magazines were obscene but the Supreme Court reversed. Justice Harlan rejected the government's "isolated excerpt" approach stating that:

> Whether "hard-core" pornography, or something less, be the proper test, we need go no further in the present case than to hold that the magazines in question, *taken as a whole,* cannot, under any permissible constitutional standard, be deemed to be beyond the pale of contemporary notions of rudimentary decency.

We cannot accept in full the Government's description of these magazines

which, contrary to *Roth* . . . tends to emphasize and in some respects overdraw certain features in several of the photographs, at the expense of what the magazines fairly *taken as a whole* depict.

370 U.S. at 489, 82 S.Ct. at 1438 (citations omitted) (emphasis added). The Court conducted an independent examination of the magazines and found that they were not obscene.

The issue again arose in *Ginzburg v. United States*, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), where Ginzburg had been convicted for violation of the federal obscenity statute. The only issue before the Court was whether the standards enunciated in *Roth* were correctly applied to "EROS," a hard-cover magazine, and "Liaison," a biweekly newsletter. The trial judge concluded that only four of the fifteen articles in "EROS" predominantly appealed to the prurient interest and substantially exceeded community standards while the other eleven articles were not offensive. Despite this quantitative determination, he found the magazine to be obscene taken as a whole. The Court stated that:

> Our affirmance of the convictions for mailing EROS and Liaison is based upon their characteristics *as a whole*, including their editorial formats, and not upon particular articles contained, digested, or excerpted in them. Thus we do not decide whether particular articles, for example, in EROS, although identified by the trial judge as offensive, should be condemned as obscene whatever their setting.

383 U.S. at 466, n. 5, 86 S.Ct. at 945 n. 5 (emphasis added).

While the Supreme Court has never explicitly stated that the "taken as a whole"

test is applied as strongly to magazines as to books and films, the language of *Manual Enterprises* and *Ginzburg* gives every indication that magazines are always to be considered as whole works even though made up of separate articles. The only exception occurs when there is a sham attempt to insulate obscene material with non-obscene material. *See Kois v. Wisconsin, supra*; *Flying Eagle Publications, Inc. v. United States*, 285 F.2d 307 (1st Cir. 1961); *Louisiana v. Gambino*, 362 So.2d 1107 (La.1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2042, 60 L.Ed.2d 402 (1979); *Washington v. J–R Distributors, Inc.*, 82 Wash. 584, 512 P.2d 1049 (1973).[4] This would occur, for example, if the most obscene items conceivable were inserted between each of the books of the Bible. But under existing law, the judges and juries are able to identify shams in which non-obscene material is used as a vehicle to insulate obscene material. As established in *Ginzburg*, the "taken as a whole" test is not quantitative. Under *Miller*, even one obscene item contained in a work would be sufficient to support a finding that the entire publication is obscene if, "taken as a whole," the publication lacks serious value.[5] The "taken as a whole" test is not inconsistent with the recognition of shams.

This court has impliedly reached a similar position in two decisions involving the same defendant. *United States v. Thevis*, 484 F.2d 1149 (5 Cir. 1973), *cert. denied*, 418 U.S. 932, 94 S.Ct. 3222, 41 L.Ed.2d 1170 (1974) (*Thevis I*); *United States v. Thevis*, 526 F.2d 989 (5 Cir.), *cert. denied*, 429 U.S. 928, 97 S.Ct. 335, 50 L.Ed.2d 299 (1976) (*Thevis II*). In *Thevis I* this court reviewed a conviction of Mike Thevis for violating the federal obscenity statute. The

4. The one case cited by appellant that does not involve a sham was *Belleville v. Morgan*, 60 Ill.App.3d 434, 17 Ill.Dec. 558, 376 N.E.2d 704 (1978). While we are certainly not governed by an Illinois appellate court, this decision deserves consideration because the court correctly applied the "taken as a whole" test to magazines similar to those involved in this case and found most of them obscene under the *Miller* test. While the February 1976 issue of "Play-

boy" was found not obscene, issues of "Playgirl," "Viva," "Genesis," and "Gallery" were declared obscene. The obscene magazines possess a format and contents similar to "Penthouse" and "Oui."

5. This of course assumes that the first and second prongs of the *Miller* test are also met.

material involved included twelve different magazines which were distributed before the *Miller* decision but after *Memoirs*. This court ruled that the magazines were to be tested under both the *Miller* "serious value" test and the *Memoirs* "without redeeming value" test with Thevis receiving the benefit of the more lenient test. While all twelve magazines were obscene when the *Miller* test was applied, only six of the magazines were obscene under *Memoirs*. The reversal with respect to the six magazines was based upon the literary merit of several articles in each magazine. This court stated that:

> We have distinguished these six from the remainder on the basis of their significant content of literary matter, including short stories of at least arguable merit as well as discussions of lesbianism, homosexuality, nudity, censorship, photography, marital sexual problems, and the nude in fine art. The inclusion of this literary matter in significant proportions precludes a finding, in our judgment, that the six magazines are "utterly without redeeming social value." The issue as to these six is close, due to the numerous pornographic pictures included with the literary matter. Indeed, the pictures in each instance are the principle content of the magazines and would, standing alone, be found obscene.

Essentially the same situation arose in *Thevis II* where this court found all of the materials obscene except one magazine, "Lezo," because it contained "a serious discussion of female homosexuality." The inclusion of the literary matter in significant portions precluded any determination that the magazine did not meet the *Memoirs* test.

The importance of the decisions in *Thevis I* and *Thevis II* revolves around the finding that while various parts of the magazines were admittedly obscene and these obscene parts were not related to the non-obscene parts, the magazines were still not obscene when considered as a whole. *Thevis I* and

*Thevis II* demonstrate this court's rejection of the "isolated excerpt" approach supported by the appellant. In both cases, this court considered the magazines as a whole and found that some of the magazines were not obscene because they contained some matter warranting protection, even though they also included admittedly unrelated and obscene material. Like many other courts, this court does not support the piecemeal approach advocated by appellant. *See Right to Read Defense Comm. v. School Comm. of the City of Chelsea*, 454 F.Supp. 703 (D.Mass.1978); *Louisiana News Co. v. Dayries*, 187 F.Supp. 241 (E.D.La.1960); *Pierce v. State*, 145 Ga.App. 680, 244 S.E.2d 589 (1978), *cert. denied*, 439 U.S. 1088, 99 S.Ct. 869, 59 L.Ed.2d 55 (1979); *Hess v. State*, 145 Ga.App. 685, 244 S.E.2d 587 (1978); *Simpson v. State*, 144 Ga.App. 657, 242 S.E.2d 265, *appeal dismissed*, 439 U.S. 887, 99 S.Ct. 241, 59 L.Ed.2d 233 (1978); *see also Leech v. American Booksellers Assoc., Inc.*, 582 S.W.2d 738 (Tenn.1979).

In his supplemental post-argument brief, appellant apparently submits that even though a magazine *may be* treated as a "work, taken as a whole" in some situations, this is a determination that must be made on a case-by-case basis. If this is a correct statement of the law, appellant contends that we are not governed by our previous decisions in *Thevis I* and *Thevis II*. Appellant attempts to support his position with an analysis of several cases involving newspapers. Appellant's authority is weak, at best.

In *Kois v. Wisconsin*, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), the Supreme Court, in a per curiam opinion, determined that two pictures, showing a nude man and nude woman embracing in a sitting position, accompanied by an article and a poem entitled "Sex Poem," comprising an account of the author's recollection of sexual intercourse, that were published in an underground newspaper were not obscene. Appellant attaches special consideration to the fact that the Supreme Court did not

allude to any requirement that the entire newspaper had to be "taken as a whole." The Supreme Court's opinion in *Kois* provides no authority for appellant's claim. The Supreme Court, in an effort to reach its decision on the narrowest ground, merely determined that the poem and the pictures accompanied by the article were not obscene. Therefore, it was unnecessary to determine whether the arguably obscene items were not obscene when the newspaper was taken as a whole.

Appellant next examines *United States v. Head*, 317 F.Supp. 1138 (E.D.La.1970), again involving an underground newspaper that contained a picture of a nude male masturbating in front of a wall covered with nude female pinups. The court refused to merely observe the picture, by itself, and found that the newspaper, taken as a whole, was not obscene. The court stated that:

> Although several other items besides the picture in question advert to sexual matters, and Anglo-Saxon and colloquial words are used to refer to human organs, bodily functions and sexual relations, the sixteen-page newspaper is devoted predominantly to libidinally neutral news reports, poetry, artwork and discussions of topics generally of interest to the particular community that the newspaper seeks to serve. Contrary to the government's assertions, it is remarkably uniform in its approach to its general subject—the assumed foibles of the way of life generally accepted in this country today. Because it is a newspaper it is comprised of discrete articles, but it is more thematically integrated than most magazines or newspapers of general circulation and, in this regard, it adopts a single point of view of life, much like a novel or a film.

317 F.Supp. at 1144. Appellant attempts to contrast the decision in *Head* with a state court decision in *Scherr v. Municipal Court*, 15 Cal.App.3d 930, 93 Cal.Rptr. 556 (1971). In *Scherr*, the court in essence found it impossible to take a particular issue of an underground newspaper as a whole in its

entirety. Appellant interprets the alleged conflict between *Head* and *Scherr* as a statement that the proper rule is that a court's determination that a particular publication must be taken as a whole is limited to the publication before the court and possesses no precedential value. We cannot accept appellant's contention.

First, appellant's authority deals only with newspapers. It is possible that any value attributable to *Kois, Head*, and *Scherr* is limited to newspapers. While a magazine usually is not as thematically integrated as a book or a movie, it certainly is more so than a newspaper.

Second, appellant reads too much into the *Scherr* decision. The holding of the California court was merely that a municipal court would not exceed its jurisdiction if it proceeded with the case. The court merely refused to give the defendant a petition for prohibition which would have stopped the municipal court proceeding. While the court stated in dicta that a different rule might be applicable to newspapers and found no authority for the proposition that a newspaper containing obscene material *must* be held non-obscene because it also contained matters of social importance, it did not reach the obscenity issue. The court merely preferred to wait for the result in the trial court after full use of trial and pre-trial procedures before it made an independent review of the obscenity of the newspaper in question.

Third, the January 1978 issues of "Playboy," "Penthouse," and "Oui" are similar to the newspaper in *Head* in that they are "more thematically integrated than most magazines or newspapers of general circulation." 317 F.Supp. at 1144. Even if appellant's case-by-case analysis is a correct statement of the law, the magazines in question resemble the newspaper examined in *Head* more than the *Scherr* newspaper. While the parts of a magazine may not be interrelated in the same manner as a particular episode in a novel to the balance of the book, it is the interrelation between the

various features or articles of a magazine and the magazine's basic editorial philosophy or purpose that is significant. The editorial policy acts as a boundary within which each item detailed in the magazine must be found. Each feature and article must be consistent with that policy. *See Pinkus v. United States*, 436 U.S. 293, 98 S.Ct. 1808, 56 L.Ed.2d 293 (1978).

"Playboy" has been published for over twenty-five years and has been governed by the same editorial policy, "Entertainment for Men." Its principal audience is the urban male between the ages of 25 and 35. The features of the January 1978 issue of "Playboy" are consistent with the editorial philosophy. Included are two short stories dealing with sport themes, a panel discussion on unidentified flying objects, an interview with philosopher Jean-Paul Sartre, an interview with Alex Haley, a series of articles about movie making, reviews of records, books, and movies, an advice column, features on menswear, grooming, food and drink, gift selections, and several features and pictorials dealing with sex or beautiful women.

"Oui" has been published since 1972 and has an editorial philosophy similar to that of "Playboy." The only significant difference between the two magazines is that the target audience of "Oui" is slightly younger adults. The January 1978 issue of "Oui" includes an article concerning obscenity and the First Amendment, an interview with Jacqueline Bisset, a piece about television shows that remain popular long after their demise, a spoof on revolutionary tactics, several short stories, reviews of movies and music, and several features and pictorials dealing with sex and nude women. Again, these items are consistent with the overall editorial policy of "Oui."

"Penthouse" has been published in the United States since 1969 and has an annual worldwide circulation of 60,000,000 copies per year. The editorial policy of the publishers of "Penthouse" is similar to the policy of "Playboy." This editorial policy has resulted in many journalistic awards for the magazine and its editor. Consistent with its editorial policy, the January 1978 issue of "Penthouse" contained an article about Foreign Affairs Advisor Brzezenski, an article entitled "Africa, Jimmy Carter's Vietnam," reviews of books, movies, music, theatre, films, and television, men's grooming aids, several short stories (fiction and non-fiction), as well as stories dealing with sex-related subjects and photographs of nude women including a detachable color photograph measuring 21 inches by 32 inches entitled "Pet Poster" that was included in the magazine.

We conclude that even if appellant's case-by-case analysis is a correct statement of the law, the January 1978 issues of "Playboy," "Penthouse," and "Oui" resemble the underground newspaper found in *Head* more than the newspaper found in *Scherr.* Therefore, the entire magazine constitutes a work that must be "taken as a whole" when determining whether the magazines possess serious value.

■ In making our independent review to determine whether the materials in question are constitutionally protected, we have examined the January 1978 issues of "Playboy," "Penthouse," and "Oui" and have found that, taken as a whole, "Penthouse" and "Oui" lack serious literary, artistic, political or scientific value. Each of the magazines contains articles possessing serious value as was indicated by Judge Freeman when he described the contents of each magazine as follows:

> For instance, the January issue of "Playboy" contained *inter alia*: (1) an interview with Jean-Paul Sartre; (2) "The Eleventh Hour Santa," a piece on last minute Christmas shopping ideas; (3) "Alex Haley's Candid Conversations," a reprint of the former Playboy interviewer's conversations with public figures such as Miles Davis, Cassius Clay, Malcolm X, Martin Luther King, Jr., and George Lincoln Rockwell; (4) a four article series concerning "Movie Making, Sev-

enties Style" and (5) "Doctor Fast," a fiction piece by Erich Segal.

Likewise, the January, 1978 issue of Penthouse contained *inter alia*: (1) "Cartergate III" an article about the power and policies of United States Foreign affairs adviser Zbigniew Brzezinski; (2) "Africa, Jimmy Carter's Vietnam" by noted author Tad Szulc; (3) "The Vietnam Veteran's Advisor"; (4) "Improving Perfection"; a review of the 1978 Volvo 262C; and (5) "Why Carter Has To Give Away The Panama Canal In Order To Sell Out Taiwan" by Nicholas Von Hoffman.

Finally, the January, 1978 issue of "Oui" contains *inter alia*: (1) "Taking on the Censors," an article concerning obscenity and the First Amendment; (2) an interview with Jacqueline Bisset; (3) "The Fright Report" in which author Stephen King comments upon his works; (4) "Cult T.V.," a piece about television shows that have remained popular long after their demise, and (5) "Hey Kids, Lets Rent The Old Barn And Plan An Invasion of Haiti," a spoof on revolutionary tactics and notions.

In *Jenkins* the Supreme Court examined other factors indicating that the film "Carnal Knowledge" had serious value such as the existence of several favorable reviews and the fact that the film was on the "Ten Best" list for 1971. An examination of similar factors applicable to the magazines in question indicate serious value. "Penthouse" and its editor have received awards from the Columbia University School of Journalism, The Overseas Press Club, and Brandeis University. All three magazines also attract advertising by national concerns. "Penthouse" has an annual worldwide circulation of sixty million magazines. The monthly circulation of "Playboy" is slightly less than five million copies and that of "Oui" is about one million copies. "Playboy" has been published since 1953 and its subscribers include approximately 950 libraries in the United States. Each of these factors provide additional support for the contention that any of the three magazines in question possess serious value.

Each magazine contains items which, standing alone, would be found obscene. Only "Playboy," taken as a whole, appears to possess serious value. The problem with "Penthouse" and "Oui" that distinguishes them from "Playboy" is that the latter magazine possesses a significant content of literary matter including short stories, interviews, and panel discussions of great merit. The inclusion of this literary matter in significant proportions precludes a finding that "Playboy" taken as a whole lacks serious literary, artistic, political or scientific value. The issue with respect to "Penthouse" and "Oui" is close but the numerous pictorials and obscene letters were not saved by the articles possessing some literary merit. *See* Table I, *infra*.

In "Penthouse," the pictorial materials included not only the "Pet Poster" and the section entitled "Tender Loving Carrie," described earlier, but also a pictorial presentation entitled "Tropic of Capricorn." In this set of pictures, a woman is pictured in naked and semi-nude poses which expose either her breasts or her genitals or both, accompanied by text material in which she extolls the pleasures of sexual fantasies and experimentation. Many of the accompanying photographs show her with legs outstretched and genitals bared, while she manipulates her breasts or her genitals. The pictorial presentation entitled "Tender Loving Carrie," in addition to the pictures described above, also includes a two-page color centerfold photograph in which the woman is pictured, legs apart, baring the outer and inner lips of her genitals and her anus. Similar photographs appear in the pictorial presentation entitled "Belle D'Azur" and in the "Pet Poster." Also included are patently offensive descriptions of sexual conduct, described above, in the form of letters from readers and articles as well as sexually suggestive cartoons and off-color cartoon material labeled as satire. Taken as a whole, "Penthouse" appears to lack serious value.

The same can be said about "Oui." It also includes patently offensive descriptions of sexual conduct in the items entitled "Sex Tapes" and "Sex Tape Letters," as described above, as well as sexually suggestive and off-color cartoons. The pictorial presentations entitled "Maria" and "Eve" included pictures of a woman in nude or semi-nude poses which exposed either their breasts or genitals or both. The pictorial presentation entitled "Two Girls in Paris" pictured two nude women in a manner suggesting or simulating homosexual conduct. Even when these items are viewed in conjunction with the articles possessing some literary merit, taken as a whole, "Oui" does not possess serious value.

In summary, because the *Miller* test is conjunctive, the district court correctly determined that "Playboy" is not obscene but erred with respect to its decision as to "Penthouse" and "Oui." Our conclusions are summarized in the following table:

TABLE I

| Magazine Titles | (a) The average person, applying contemporary community standards, would find that the work taken as a whole appeals to the prurient interest | (b) Patently offensive depiction or description of sexual conduct specifically defined by applicable statute | (c) Taken as a whole, lacks serious literary, artistic, political or scientific value |
|---|---|---|---|
| 1. Playboy | No | No | No |
| 2. Penthouse | Yes | Yes | Yes |
| 3. Oui | Yes | Yes | Yes |

AFFIRMED in part; REVERSED in part.

CHARLES CLARK, Circuit Judge, concurring:

I concur in the result of Judge Thornberry's opinion and in almost everything he writes. Respectfully, I cannot agree with Judge Thornberry's conclusion that the only act of "sexual conduct" as defined by Georgia law arguably depicted in the January issue of *Oui* and *Penthouse* was lewd exhibition of the genitals. In the pictorial entitled "Two Girls in Paris" in *Oui,* two naked females are depicted in a bathroom and bedroom in various positions which the text makes plain are of lesbian embrace and foreplay. In two of its naked-female pictorial sections, *Penthouse* includes pictures of women practicing or simulating masturbation. With the camera aimed at the genitals, each is posed eyes closed, mouth open, fingering her clitoris. The accompanying text contains passages which reinforce the masturbatory imagery.

In addition to text materials which Judge Thornberry adjudges obscene, I find extensive pictorial and verbal portions of *Oui* and *Penthouse* which violate Georgia law in a patently offensive way. Because of these additional materials, I completely agree with Judge Thornberry's application of *Miller's* second prong in respect to these publications.

Although I am in full agreement with Judge Thornberry's analysis of existing precedent relating to application of the "taken as a whole" test to magazines, I write further only to observe that this rule of law in its present state of development creates needless uncertainty for everyone involved.

In its first two tests, *Miller* (i) adopts a community's standard of prurience and (ii) permits the community to codify specific bans on sexual conduct. An overbroad interpretation of whether, "taken as a whole," a publication as loosely structured as these magazines lacks serious literary, artistic, political or scientific value could deny all meaning to those standards of morality and decency. How then is this third test to be applied? Should it weigh the good against the bad, *i. e.*, does one brilliant article on the arts outweigh explicit pictures of a couple copulating, or does one series of pictures portraying the rape and mutilation of a child outweigh two average articles on politics or science? When the materials are totally independent of every other portion of the publication except through a claimed appeal to some interest of the magazine's expected audience, I submit that segment ought to be separately appraised. If it is totally independent, it ought not be carried, Typhoid Mary-like, into a community by other articles which show serious merit. Ipse dixit judicial pronouncements on the value of an individual magazine "as a whole" are no more helpful than the "I know it when I see it" approach. Until the court permits separate appraisal of each discrete segment of the hodgepodge, publishers, community, policeman, and judge will have to continue to wonder what the drum says.

I don't like to find myself in disagreement with Judge Kravitch and Judge Freeman, who live in Atlanta, about the contemporary community standards of Fulton County, Georgia, but as Judge Thornberry so aptly puts it, my appellate judicial responsibility in this regard is to be exercised independently of theirs. I do not pretend to know every citizen, community, or family value that comprise that bustling, cosmopolitan metropolis, but I know enough of them to make a sure, true judgment that the average person in Atlanta applying contemporary community standards would find the January issues of both *Penthouse* and *Oui*, taken as a whole, to appeal to the prurient interest and to lack serious literary, artistic, political, or scientific value.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I join the majority in the decision that (1) appellant's conduct constituted an illegal prior restraint, (2) *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), requires an evaluation of a magazine "as a whole" rather than as separate component parts and (3) the publication "Playboy" is not obscene. I disagree with the majority that the January 1978 issues of "Penthouse" and "Oui" are obscene under the *Miller* criteria.

The very able discussion in the majority opinion of the laws pertaining to obscenity in relation to the First Amendment and especially of the application of *Miller v. California* to publications obviates the necessity of repetition. As the majority pointed out, all three elements of the three-prong *Miller* test [1] must be satisfied before a publication "as a whole" can be adjudicated obscene and not entitled to the protection of the First Amendment. I agree with this analysis of the law; I disagree with its application to the publications "Penthouse" and "Oui".

The Supreme Court, in adopting the first prong of *Miller*, obviously understood that community standards vary and therefore intended that the applicable standards be determined by the fact finder, jury or judge

---

1. As provided by the Supreme Court in *Miller, supra*, the test is:

    (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest . . . ; (b) whether the work depicts or describes, in a patent- ly offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

    413 U.S. at 24, 93 S.Ct. at 2615.

as the case might be, of the particular community involved. Here, the district judge, drawing upon his personal knowledge as a resident of Fulton County, Georgia, as well as the testimony of experts introduced at the trial, found that, applying contemporary community standards of Fulton County, "Penthouse" and "Oui" taken "as a whole" did not appeal to a prurient,[2] i. e. "shameful or morbid," interest in sex. The majority rejected this finding and further determined that both magazines contained patently offensive depictions and descriptions of proscribed conduct and as a whole lacked serious literary, artistic, political or scientific value, thus satisfying all three prongs of the *Miller* test.

I do not argue with the majority's conclusion that *certain* of the articles and photographs in both magazines [3] are not only

vulgar, crude and beyond the limits of acceptable taste, but also appeal to a prurient interest, are patently offensive depictions of proscribed conduct and lack serious literary and artistic value. An evaluation of *certain* items is not the test, however. The magazines must be judged "as a whole" rather than by specific discrete segments.

Admittedly, the "as a whole" test cannot begin and end with a page count. The quantity of the objectionable material is, however, one aspect which must be considered when determining whether the first prong has been satisfied. The quality or degree of offensiveness is also relevant. A careful analysis of both of these magazines including the total number of pages containing objectionable material as contrasted with nonobjectionable,[4] the degree of offen-

2. It should be noted that the court must determine what constitutes a normal interest in sex, i. e. non-prurient, and distinguish material which appeals to that interest from material which appeals to a shameful or morbid, i. e. prurient, interest in sex.

3. In "Penthouse": for example, certain letters in "Penthouse Forum" and several photographs in the "Pet Poster", "Tender Loving Carrie" and "Tropic of Capricorn" series. In "Oui": portions of "Sex Tapes", "Sex Tape Letters" and several photographs in the series "Two Girls in Paris".

4.
                                    Penthouse

|  | No. of Pages |
|---|---|
| Total Pages | 219 |
| Advertisements (generally of nationally advertised non-sex related products) | 55 |
| Articles | |
| Sexual | 10(0)* |
| Nonsexual | 27 |
| Fiction | 12 |
| Short Features (mixed sexual and nonsexual) | 8 |
| Consumer News | 13 |
| Photo Layouts | 49(6)* |
| Cartoons | 19 |
| Letters to the Editor, Table of Contents, etc. | |
| Sexual | 18(18)* |
| Nonsexual | 8 |

*The numbers in parentheses denote those pages of sexual items that may be said to contain patently offensive material judged by the prevailing community standards in Fulton County because of style of depiction involved (lewdness of pose, focus of the camera, language, etc.). Although there is no necessary congruence between degree of offensiveness of the material and whether the material appeals to a prurient interest, for purposes of analysis under part (a) of the *Miller* test, those patently offensive pages have been considered to *arguably* appeal to the prurient interest. Note that if one picture out of many on a given page is considered to appeal to a prurient interest, the entire page has been counted in the parenthetical number.

siveness,[5] together with Judge Freeman's fact-finding compels a conclusion that "Penthouse" and "Oui" do not meet prong (a) of the *Miller* test.

The third prong of *Miller* also requires evaluating the magazines "as a whole": weighing those portions which possess serious literary, artistic, political or scientific value against those which do not. "Penthouse" encompasses a wide spectrum of subjects: politics, science, consumer information, fiction, as well as sex. Some articles by nationally recognized authors are of excellent quality; others are of mediocre or questionable quality and certain segments would be classified obscene.[6] Applying the

### Oui

|  | No. of Pages |
| --- | --- |
| Total Pages | 139 |
| Advertisements (generally of nationally known non-sex related products) | 20 |
| Articles | |
| Sexual | 7(3)* |
| Nonsexual | 39 |
| Fiction | 0 |
| Short Features (mixed sexual and nonsexual) | 14 |
| Consumer News | 2 |
| Photo Layouts | 31(3)* |
| Cartoons | 15 |
| Letters to the Editor, Table of Contents, etc. | |
| Sexual | 3(3)* |
| Nonsexual | 8 |

\* The numbers in parentheses denote those pages of sexual items that may be said to contain patently offensive material judged by the prevailing community standards in Fulton County because of style of depiction involved (lewdness of pose, focus of the camera, language, etc.). Although there is no necessary congruence between degree of offensiveness of the material and whether the material appeals to a prurient interest, for purposes of analysis under part (a) of the *Miller* test, those patently offensive pages have been considered to *arguably* appeal to the prurient interest. Note that if one picture out of many on a given page is considered to appeal to a prurient interest, the entire page has been counted in the parenthetical number.

---

5. Except for "Two Girls in Paris", the depictions are solitary figures and none of the articles or pictures are lurid, graphic or objectionable to the extent of tainting the publications "as a whole."

6.

### Penthouse

#### Contents

| Cover | | Photo by Stan Malinowski |
| --- | --- | --- |
| Housecall | Introduction | |
| Forum | Correspondence | |
| Feedback | Opinion | |
| Call Me Madam | Counsel | Xaviera Hollander |

third prong of *Miller*, quantitatively and qualitatively balancing the contents, I conclude that "as a whole" "Penthouse" does not lack serious literary, political, scientific or artistic value.

I cannot say the same for "Oui". Although "Oui" contains some diversity of subject matter and several articles of average quality,[7] again balancing the contents both quantitatively and qualitatively, considering the range and calibre, the reputation of authors and the method of presentation, I do not find that the magazine "as a whole" possesses *serious* literary, artistic, political or scientific value.

Accordingly, because neither publication, "Penthouse" nor "Oui", satisfies all three criteria, I conclude that they are not ob-

### Penthouse

Contents

| | | |
|---|---|---|
| View From The Top | Comment | Robert S. Wieder |
| Scenes | | Marilyn Stasio |
| Films | | Roger Greenspun |
| Words | | Robert Stephen Spitz |
| Sounds | | Vernon Gibbs |
| Cartergate III: The Thoughts of Chairman Brzezinski | Article | Craig S. Karpel |
| Tropic of Capricorn | Pictorial | Photos by Earl Miller |
| Africa: Jimmy Carter's Vietnam | Article | Tad Szulc |
| Pretty Baby | Profile | Robert Stephen Spitz |
| The Mime | Fiction | Joyce Carol Oates |
| Anita Bryant | Interview | Sandra Shevey |
| Separate (Components) But Equal | Service | Harold Rodgers |
| Tender Loving Carrie | Pet of the Month | Photos by Stan Malinowski |
| Vietnam Veterans Adviser | Service | |
| Why Carter Has To Give Away The Panama Canal In Order To Sell Out Taiwan | Essay | Nicholas von Hoffman |
| Happy Hookers | Humor | Walter Gallup |
| Dressed To Kill | Fashion | Ed Emmerling |
| The Skins Of Peggy | Humor | Nick Tosches |
| Belle D'Azur | Pictorial | Photos by Otto Weisser |
| Couples: The Sex Fantasists | Survey | |
| Volvo: Improving On Perfection | Service | Joe Kelleher |
| Many Happy Returns | Service | |
| Oh, Wicked Wanda! | Satire | Frederic Mullally/ Ron Embleton |

### Oui

7.    Contents

| | | |
|---|---|---|
| Mail (Delighted readers respond.) | | |
| Openers (Arab dating guide, plus other stuff.) | | |
| Sex Tapes (Sex among the politically powerful.) | | |
| Revue (Mano picks the worst.) | Criticism | |
| Maria (Her brother was right. She's a good girl.) | Pictorial | |
| Taking On The Censors (The *Miller* decision and its victims.) | Article | Robert Sabbag |
| Nose Job (On picking out the perfect proboscis.) | Article | Donald Bowie |

scene under *Miller*.[8] Although these magazines are personally distasteful, my reading preferences are not at issue. What is at issue is freedom of expression under the First Amendment.

I would affirm the district court's decision. I therefore concur in part and dissent in part.

Oui

Contents

| | | |
|---|---|---|
| The History Of Schoolgirls In American Movies (Teen meat in the mass market.) | Article | Mitch Tuchman |
| The Little Man In The Boat (Once and for all, how to make a woman come. And come again.) | Article | Lisa Southern |
| Eve (She wants to take a bite out of the fruit of the luminary.) | Pictorial | |
| Conversation With Jacqueline Bisset (The screen's smartest cupcake talks about life in and out of her wet T-shirt.) | Interview | |
| Compact Hi-Fi (Six little stereo sets that will squeeze into tight places.) | Consumer News | |
| The Fright Report (The author of *Carrie* tells what it's like to scare people shitless.) | Article | Stephen King |
| Cult TV (Fifteen shows of yesteryear. They don't make television like this anymore, and they probably never did.) | Article | |
| The Girls of Madame Claude (Inside Paris' luxury cathouse.) | Pictorial | |
| Hey, Kids, Let's Rent The Old Barn And Plan An Invasion Of Haiti (Battle plan) | Humor | Jim Hougan |
| Two Girls In Paris (Air France lost their luggage so they go around bare-ass.) | Pictorial | |

Although the "Penthouse" table of contents is precisely reproduced in footnote 6, such precision of reproduction is not possible with "Oui" because "Oui's" table of contents includes pictures which cannot be reproduced here. The editorial descriptions of the articles in the "Oui" table of contents is copied from the original.

8. Thus using the table adopted by the majority:

| | (a) | (b) | (c) |
|---|---|---|---|
| Magazine Titles | The average person, applying contemporary community standards, would find that the work taken as a whole appeals to the prurient interest | Patently offensive depiction or description of sexual conduct specifically defined by applicable statute | Taken as a whole, lacks serious literary, artistic, political or scientific value |
| 1. Playboy | No | No | No |
| 2. Penthouse | No | Yes | No |
| 3. Oui | No | Yes | Yes |