TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00290-CR







Gareth Rees, Appellant



v.



The State of Texas, Appellee







NO. 03-94-00291-CR







Terrel Denise Johnson, Appellant



v.



The State of Texas, Appellee







FROM THE COUNTY COURT AT LAW NO. 7 OF TRAVIS COUNTY


NOS. 400,780 & 400,781, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING







 A jury convicted appellants Gareth Rees and Terrel Denise Johnson of the offense
of promotion of obscenity. Tex. Penal Code Ann. § 43.23(c) (West 1994). (1) The trial court
assessed each appellant's punishment at confinement in the county jail for one hundred eighty days
and a fine of $2,000.00, probated for one year. The jury acquitted appellants of charges of
harmful display of obscene material to minors. The charges against appellants were joined for
trial before the same jury, and on appeal, appellants filed a consolidated brief. Three points of
error challenge the sufficiency of the evidence, and three points of error complain of the court's
jury charge. We will affirm the judgments of the trial court.

 Infosex, a live call-in program produced by appellant Johnson and hosted by
appellant Rees was telecast for several months on an Austin Community Television Cable access
channel. During the Infosex program aired on August 23, 1993, between 12:00 a.m. and 2:00
a.m., appellants exhibited a film called Midnight Snack. The showing of Midnight Snack resulted
in charges against and convictions of appellants. The indictments in pertinent part allege
appellants



knowing the content and character of certain material was obscene, to-wit: One
(1) video tape depicting a man with the penis of another man in his mouth, a man
placing his finger in the anus of another, a man licking with his tongue the anus of
another and two men masturbating each other, did then and there promote said
material by transmitting, exhibiting, disseminating and present said video tape
during a broadcast on an Austin Cablevision channel.



 The indictments charging appellants with promoting obscene material describe the
acts depicted in the film Midnight Snack. Jury instructions tracked the indictments authorizing
appellants' conviction for promoting the acts portrayed in the film Midnight Snack. Appellants
assert that the film Midnight Snack was an integral part of the Infosex program and that because
the State did not even attempt to prove that the entire Infosex program was obscene the evidence
does not support appellants' convictions. On the other hand, throughout the prosecution and now
on appeal, the State insists that it need not prove that the entire Infosex program was obscene but
need prove only that the film Midnight Snack was obscene. Therefore, we must decide whether
the film Midnight Snack may alone and separately be considered in determining if appellants
promoted obscene material. We will first address appellants' fourth point of error in which they
assert the trial court erred in failing to instruct the jury to consider the Infosex program as a
whole.

 Although they were acquitted, appellants had been charged with and were on trial
for the harmful display of obscene matter to minors. To prove these charges, the State offered
the testimony of a minor and expert testimony. Also, in an apparent attempt to show
circumstantially that some of the callers and viewers were minors, the State offered in evidence
not only the film Midnight Snack but the entire tape of the Infosex program.

 The Infosex program starts with an introductory film clip of a "shower scene" in
which the sole actor is appellant Rees. Rees is nude with his back to the camera, legs spread and
his scrotum visible. Rees caresses his body, saying he loves his body, and slowly turns until he
presents a fully nude frontal view. He fondles his testicles and penis and expresses a belief that
he is about to ejaculate. Rees testified that he showed the shower scene as an introduction to the
Infosex programs to gauge viewers' reactions. During the program, viewers called in with
comments on the shower scene.

 After this introduction, Rees conducts the Infosex program in a bare studio while
sitting several feet above the floor on the top steps of a moveable stair unit. Rees is wearing a
robe which he tells the television audience is a gift from his lover. He points out that the robe
allows glimpses of his underwear. During a part of the program, Rees holds a toy panda bear. 
Rees informs his audience that he is homosexual and H.I.V. positive.

 While Rees is fielding calls, some callers direct hateful and offensive language
toward Rees and his stated lifestyle. One caller carries on a long conversation saying he is
homosexual and H.I.V. positive, describing his symptoms and condition; he then ends his call
reviling Rees with abusive language. Rees acknowledges that he was fooled by the caller's hoax. 
In one call, a man claims he is H.I.V. positive and asks about the transmission of the virus and
safe-sex techniques. Rees tells him that H.I.V. can be transmitted through oral sex and that you
need to make sure you wear a condom. Rees verbally describes a "dental dam," how to make one
from a condom, and says that it should be used when performing oral sex on a woman, or
"rimming" a man (anilingus). Rees tells the caller, "I don't want you to feel you have to give up
your sex life just because you are H.I.V. positive. You will just have to look at sex in a different
way."

 Rees discusses sexually transmitted diseases and the transmission rates among
different population groups. He discusses and disapproves of the "tea room" practice among some
gay men. Many of the callers do not talk about Rees' announced theme of the program, sexual
fantasies. Some callers' voices sound young, and Rees, apparently perceiving them to be
children, cuts them off telling them they should be in bed.

 During the second hour of his Infosex program, Rees says he is ready to show a
film produced by the New York organization, Gay Men's Health Crisis. He says it is primarily
for gay men, but he promises that he will in future programs show explicit films for his
heterosexual audience. Rees introduces the film:



 Now, there's this little clip that I'm going to show you, and sex is not just
limited to, to the bedroom, okay? And, like, we all know in our fantasies, you
know, when we fantasize, we can probably fantasize about having sex on the
beach, or in the car, or outside in your backyard, for instance. Um, and of course,
if you have a big apartment or a big house, there's the kitchen, there's the living
room, there's the dining room, there's the shower, so, um, sex is not just confined
to the bathroom or to the -- excuse me -- to the bedroom. So what you want to do,
or what you want to see in this tape, is, um, -- it's a little kitchen scene, and, um,
not only does the kitchen offer you, like, the countertop or the table, you know,
to have sex on, but also the refrigerator, there's lots of goodies that you can use
to enhance your sex life. Then again you could take these goodies in a picnic
basket and go outside somewhere, um, in a wheat field, a corn field, and lay out
a blanket and just have sex out there and, and take out, you know, the
marshmallow cream, or, you know, the, the chocolate sauce, and, you know, rub
it around your body and, you know, enjoy licking your partner at the same time
while enhancing your taste buds.



 The film Midnight Snack is then exhibited to the television audience. It shows a
kitchen scene with two nude adult males. There is no dialogue. One man is leaning forward
resting his upper torso on a table, and the other man engages in anilingus. Following this, the
pair embrace kissing each other. The camera then focuses on the pair's erect penises while they
masturbate each other. Next, the couple performs fellatio with whipped cream applied to one
man's penis and a condom drizzled with honey is placed on the other man's penis. After the
showing of Midnight Snack, Rees makes a few comments, fields several calls and the program
ends.

 Appellants argue vigorously that the purpose of the Infosex program was to promote
safe sexual practices and that Midnight Snack was an integral part of the program. Appellants
offered extensive expert testimony in support of their theory of the case. Rees stated on the
program that abstinence from sex, except in monogamous relationships, was desirable, but
unlikely. Therefore, appellants' purported message was that the practice of "safe-sex" is fun and
prevents the spread of AIDS.

 The Supreme Court has defined obscenity:



[W]e now confine the permissible scope of such regulation to works which depict
or describe sexual conduct. That conduct must be specifically defined by the
applicable state law, as written or authoritatively construed. A state offense must
also be limited to works which, taken as a whole, appeal to the prurient interest in
sex, which portray sexual conduct in a patently offensive way, and which, taken
as a whole, do not have serious literary, artistic, political, or scientific value.


The basic guidelines for the trier of fact must be: (a) whether "the average person,
applying contemporary community standards" would find that the work, taken as
a whole, appeals to the prurient interest, Kois v. Wisconsin, supra, at 230, 33 L.
Ed. 2d 312, quoting Roth v. United States, supra, at 489, 1 L. Ed. 2d 1498; (b)
whether the work depicts or describes, in a patently offensive way, sexual conduct
specifically defined by the applicable state law; and (c) whether the work, taken as
a whole, lacks serious literary, artistic, political, or scientific value. We do not
adopt as a constitutional standard the "utterly without redeeming social value" test
of Memoirs v. Massachusetts, 383 U.S., at 419; 16 L. Ed. 2d 1.



Miller v. California, 413 U.S. 15, 24 (1973). While the Supreme Court has not further defined
the phrase "work, taken as a whole" used in Miller, the Supreme Court and other courts have
applied the phrase in various situations, but its application remains uncertain and difficult:



 Although I am in full agreement with Judge Thornberry's analysis of existing
precedent relating to application of the "taken as a whole" test to magazines, I
write further only to observe that this rule of law in its present state of
development creates needless uncertainty for everyone involved.


 In its first two tests, Miller (i) adopts a community's standard of prurience and
(ii) permits the community to codify specific bans on sexual conduct. An over
broad interpretation of whether, "taken as a whole," a publication as loosely
structured as these magazines lacks serious literary, artistic, political or scientific
value could deny all meaning to those standards of morality and decency. How
then is this third test to be applied? Should it weigh the good against the bad, i.e.,
does one brilliant article on the arts outweigh explicit pictures of a couple
copulating, or does one series of pictures portraying the rape and mutilation of a
child outweigh two average articles on politics or science? When the materials are
totally independent of every other portion of the publication except through a
claimed appeal to some interest of the magazine's expected audience, I submit that
segment ought to be separately appraised. If it is totally independent, it ought not
be carried, Typhoid Mary-like, into a community by other articles which shows
serious merit. Ipse dixit judicial pronouncements on the value of an individual
magazine "as a whole" are no more helpful than the "I know it when I see it"
approach. Until the court permits separate appraisal of each discrete segment of
the hodge-podge, publishers, community, policeman, and judge will have to
continue to wonder what the drum says.



Penthouse International Ltd. v. McAuliffe, 610 F.2d 1353, 1373-74 (5th Cir. 1980) (Clark, Circuit
Judge, concurring).

 The State argues that the work that is to be taken as a whole should be measured
in thematic units. In other words, works or materials that are not related or united by a theme
should not be taken as a whole. As one commentator put it:



The New York courts have followed the approach of evaluating each story or
article separately. "If any single item [in a magazine] considered as a whole, were
pornographic, the circumstances that it was included in a collection otherwise
without taint would not save it from criminal prosecution." But it has also been
suggested that, in general, the entire "physical item," that is, book, magazine, or
other item, be looked at as a unit. If the "physical item" test were rigidly applied,
however, it would be far too easy to include hard-core pornography as one article
in a magazine also containing excerpts from the writings of D. H. Lawrence or
James Joyce.



Frederick F. Schauer, The Law of Obscenity, p. 108-9, Bureau of National Affairs, Inc. 1976.

 The opinion in Kois v. Wisconsin, 408 U.S. 229 (1972) indicates that the work to
be taken as a whole should be measured in thematic units and not in physical units. In Kois, an
underground newspaper carried an article about an obscenity prosecution accompanied by two
small pictures of embracing nudes. These pictures were said to be similar to those pictures which
were the subject of the prosecution discussed in the article. The court did not decide whether the
pictures alone were obscene or whether the newspaper in its entirety must be considered because
the article and the pictures were rationally related. The pictures and the accompanying article
were taken as a whole because they were thematically related. In Flying Eagle Publications v.
United States, 285 F.2d 307, 308 (1st Cir. 1961), the prosecution was for mailing obscene matter. 
The defendant complained of the trial court's refusal to instruct the jury that in determining
whether an alleged obscene illustration was obscene it must consider the accompanying article
taking them as a whole. The court rejected defendant's contention, stating:



[A] jury is not compelled to regard illustrations as controlled by textual material. 
An obscene picture of a Roman orgy would be no less so because accompanied by
an account of a Sunday school picnic which omitted the offensive details. Nor is
the principle different merely because these details might not be readily apparent
to everyone upon a casual inspection.



In United States v. Merrill, 746 F.2d 458 (9th Cir. 1984), the court used a thematic test. The
defendant mailed letters which admittedly bore a constitutionally protected message, and attached
to the letters were two playing cards depicting adults engaged in oral sex. Id. at 464. The
government did not attempt to prove that the letters, taken as a whole, lacked serious literary,
artistic, political, or scientific value. Id. at 464. The court found that the pornographic playing
cards were not a part of the theme and not a part of the message. The attached nonintegrated
playing cards could be found to make the whole letter a sham political statement. Id. at 464.

 In Goocher v. State, 633 S.W.2d 860 (Tex. Crim. App. 1982), Judge Clinton used 
the term "unit of perception," applying a "thematic unit" concept in deciding whether films were
obscene. The defendant was prosecuted for exhibiting two allegedly obscene films. The
defendant contended that because the deputy sheriff paid a single admission for a program in
which three films were shown, the jury should have been required to consider all three films in
deciding whether the program as a whole was obscene. The court rejected Goocher's contention
holding that the State properly exercised its right not to charge Goocher with exhibiting the third
film in the program.

 Infosex was a live, unrehearsed, loosely structured call-in program, a part of which
had not yet been created when the film Midnight Snack was exhibited. The announced theme of
the program was not followed. Midnight Snack was a film produced by parties other than
appellants long before the program Infosex was produced. The Infosex video exhibited to the jury
was filmed while the program was in progress. Moreover, although the State did not choose to
prosecute appellants for the exhibition and promotion of the "shower scene" film shown at the
beginning of the Infosex program, it, too, may be considered a separate "unit of perception" for
which appellants could have been prosecuted. The Infosex call-in program was a sham, a
pretense, for the promotion of both the "shower scene" film and the Midnight Snack film. Despite
appellants' argument, we conclude that the Infosex program was a vehicle used to promote and
exhibit Midnight Snack. Midnight Snack was a separate unit of perception. See Merrill, 746 F.2d
at 464; Goocher, 633 S.W.2d at 863. As the trial court properly charged the jury, Midnight
Snack is by itself the "work, taken as a whole." Appellants' fourth point of error is overruled.

 In their first two points of error, appellants urge that the State failed to prove that
the Infosex program was obscene and that viewed as a whole it lacked serious value. Thereby,
arguing that the evidence is insufficient to support their convictions. Because we have decided
that appellants could be properly prosecuted for promoting the film Midnight Snack alone and
apart from the Infosex program, the State had no burden to prove the entire program Infosex was
obscene and as a whole lacked serious value. We will overrule appellants' first two points of
error. However, we will discuss appellants' argument as it might apply to the promotion of
Midnight Snack.

 Appellants fault the State for failing to provide expert testimony that the material
is obscene. The film of the entire Infosex program is in evidence. The film Midnight Snack
shown on the program is in evidence. This evidence was before the jury and the trial court and
it is before this court for our inspection and consideration; therefore, expert testimony is not
required. Hamling v. United States, 418 U.S. 87, 100 (1974); Kaplan v. California, 413 U.S.
115 (1973); Paris Adult Theatre 1 v. Slaton, 413 U.S. 49, 56 (1973); Coon v. State, 871 S.W.2d
284, 289 (Tex. App.--Fort Worth 1994, pet. ref'd). In cases involving hard-core pornography,
the trier of fact needs no expert advice. United States v. Young, 465 F.2d 1096, 1099 (9th Cir.
1972); United States v. Wild, 422 F.2d 34 (2d Cir. 1969).

 Texas statutory provisions are fashioned after the guidelines enunciated in Miller. 
Coon, 871 S.W.2d at 287. A person commits an offense if, knowing its content and character,
he promotes or possesses with the intent to promote any obscene material. Tex. Penal Code Ann.
§ 43.23(c). The Texas Penal Code defines obscene:



(1) "Obscene" means material or a performance that:


 (A) the average person, applying contemporary community standards, would
find that taken as a whole appeals to the prurient interest in sex;


 (B) depicts or describes:


 ( i) patently offensive representations or descriptions of ultimate sexual
acts, normal or perverted, actual or simulated, including sexual
intercourse, sodomy, and sexual bestiality; or


 (ii) patently offensive representations or descriptions of masturbation,
excretory functions, sadism, masochism, lewd exhibition of the
genitals, the male or female genitals in a state of sexual stimulation
or arousal, covered male genitals in a discernibly turgid state or a
device designed and marketed as useful primarily for stimulation of
the human genital organs; and


 (C) taken as a whole, lacks serious literary, artistic, political, and scientific
value.


(2) "Material" means anything tangible that is capable of being used or adapted
to arouse interest, whether through the medium of reading, observation,
sound, or in any other manner, but does not include an actual three
dimensional obscene device.


(3) "Performance" means a play, motion picture, dance, or other exhibition
performed before an audience.


(4) "Patently offensive" means so offensive on its face as to affront current
community standards of decency.


(5) "Promote" means to manufacture, issue, sell, give, provide, lend, mail,
deliver, transfer, transmit, publish, distribute, circulate, disseminate, present,
exhibit, or advertise, or to offer or agree to do the same.

 

Tex. Penal Code Ann. § 43.21 (West 1994).

 The jury, properly instructed, found that the material promoted in Midnight Snack
was obscene. Implicit in the trial court's rulings is an independent finding that the material
promoted in Midnight Snack is obscene. In determining whether material is constitutionally
obscene, appellate courts are obliged to independently review and evaluate the material. This we
have done applying the test of Miller v. California, 413 U.S. 15, 24 (1973). See also Andrews
v. State, 652 S.W.2d 370, 383 (Tex. Crim. App. 1983). We have viewed the entire Infosex
program, including the film Midnight Snack. In our review of the findings of the jury and trial
judge, applying Miller's test, we find the evidence sufficient to support the jury's verdict and the
trial court's finding that Midnight Snack is obscene. Applying Miller's dictates, we independently
find that Midnight Snack, taken as a whole, lacks serious literary, artistic, political, or scientific
value. Its graphic, explicit depiction of two males engaged in acts of anilingus, fellatio, and
mutual masturbation constitutes hard-core pornography that is unprotected by the First
Amendment. See Davis v. State, 658 S.W.2d 572, 578 (Tex. Crim. App. 1983). Appellants' first
two points of error are overruled.

 In point of error three, appellants assert that the State failed to prove beyond a
reasonable doubt that appellants knew the Infosex program was obscene. We have held that
appellants were properly prosecuted for showing the film Midnight Snack by itself; it was
unnecessary for the State to prove that the appellants knew the entire Infosex program was
obscene. We will therefore overrule this point of error. Nevertheless, we will discuss appellants'
argument in this point of error as it might apply to the film Midnight Snack.

 As a matter of law, it is only necessary for the State to prove that appellants knew
the content and character of the film. It was as a matter of law unnecessary to allege and prove
that appellants knew the film was obscene. Tex. Penal Code Ann. § 43.23 (West 1994). See
Hamling, 418 U.S. at 120-21. However, the State needlessly added to its burden of proof by
alleging that appellants not only knew the nature and character of the material, but also that
appellants knew the material was obscene. More importantly, the State without objection allowed
the trial court to instruct the jury that to find appellants guilty they must find that appellants knew
the material was obscene.

 Although the record contains evidence that neither appellant believes that Midnight
Snack is obscene, there is ample evidence in conflict with their stated beliefs for the jury to have
found beyond a reasonable doubt that appellants knew Midnight Snack was obscene. First, there
is evidence that appellants knew the content and character of the film Midnight Snack before it was
shown on the Infosex program. Second, not only is there a presumption that appellants knew the
law of obscenity, there is affirmative evidence that appellants knew the law of obscenity.

 Johnson's grand jury testimony, which was admitted in evidence, shows appellants
previewed Midnight Snack and were aware of its content and character before it was shown. 
Rees' quoted narration immediately before the showing of Midnight Snack shows not only an
awareness and understanding of the film's nature and character but also a knowledge of the film's
prurient nature. Before showing the film, Rees also said, "This one is gay related but you can
still learn from it. There's going to be an example of rimming and that is oral contact with the
anus." Rees told his television audience and also testified that his "source" of the film Midnight
Snack was "Rick X." He also testified during direct examination that he thought the film
Midnight Snack had been shown to other audiences in the United States. On cross-examination
Rees testified that someone whom he assumed was "Rick X" filed a lawsuit in New York City in
an attempt to force public access television stations to broadcast Midnight Snack. A voice heard
on the Midnight Snack tape preceding the action states that the anilingus scenes,



did not bother Manhattan cable because there was no masturbation or insertion, so
it didn't fit anything on their list. However, the following portion which involves
fellatio and masturbation using a condom was basically off limits so they sent this
one back, too.



It may be inferred that the New York City stations would not show the film because it was
obscene under New York law. Appellants were aware of the controversy in New York City. 
Immediately following the showing of Midnight Snack, Rees, speaking to the viewing audience
referred to the film as explicit, and expressed the hope that those persons who had seen the film
could "be mature" about it. Although appellants were not charged with promoting the "shower
scene" film, that film was in evidence, and the jury could use that evidence to aid in its
determination that appellants had knowledge that Midnight Snack was obscene.

 Johnson warranted in writing to the cable system that the Infosex program did not
contain "any material that violates local, state or federal law relating to obscenity" or that was
"contrary to local, state, and federal laws." She also acknowledged in writing that she was aware
that federal law provides penalties of fines and imprisonment for transmitting obscene matter over
any television cable system. To make these statements true, Johnson had to know the law of
obscenity. Rees testified that he had seen a documentary film in October 1992, by which he
learned the law governing obscenity. Appellants knew that the statute provides that material is
obscene which depicts or describes patently offensive representations or descriptions of ultimate
sexual acts, normal or perverted, actual or simulated, including sodomy, masturbation, lewd
exhibition of the genitals or the male genitals in a state of sexual stimulation or arousal. The
evidence shows that appellants knew the content and character of the film, Midnight Snack, and
that they knew the law of obscenity. We conclude that the evidence supports the jury's finding
that appellants knew the acts depicted in Midnight Snack were obscene beyond a reasonable doubt,
and that the State proved the unnecessarily assumed burden that appellants knew Midnight Snack
was obscene beyond a reasonable doubt. Appellants' third point of error is overruled.

 In their fifth point of error, appellants argue that the jury charge improperly failed
to instruct the jury that it must find the program lacked serious educational value before it could
find it obscene. Appellants say their defense was largely based on their claim that the Infosex
program and the film Midnight Snack had educational value. They maintain the jury instructions
left the jury free to conclude that if appellants' program did not rise to the level of "serious
science" it could be judged obscene, even if the jury believed the program had serious educational
value. Because the appellants' objections to the charge encompassed the entire Infosex program
and was not limited to Midnight Snack, the objection was too broad and did not preserve the
claimed error for review. However, the trial court properly instructed the jury in accord with the
statute, Tex. Penal Code Ann. § 43.21, and as required by Miller v. California.

 In United States v. One Reel of Film, 481 F.2d 206, 210 (1st Cir. 1973), an
argument advanced by the defendant, supported by expert testimony, urged that the film Deep
Throat had educational value. There the court said:



The difficulty is that the argument proves too much. We are told by the Supreme
Court that obscene material is unprotected by the First Amendment, such material
being described as confined to "works which depict or describe sexual conduct." 
We can only read the recent cases as an express rejection of any argument that
pornography itself, because of its liberating impact, has for that reason alone,
serious literary, artistic, political or scientific value. We would be misreading the
message unmistakably transmitted by the Supreme Court were we to hold
otherwise.



Id. at 210. The overall educational value, if any, of exposure to pornography does not create
scientific value. Frederick F. Schauer, The Law of Obscenity, p. 147, Bureau of National Affairs,
1976. The trial court's charge followed the statute and was sufficient. Appellants' fifth point of
error is overruled.

 In their sixth point of error, appellants assert the jury charge improperly defined
"prurient interest." They argue that the jury should have been told that it could not find appellants
guilty if their program appealed only to the intended viewers' healthy interest in sex. The
definition of "prurient interest" submitted to the jury reads:



 "Prurient interest" means a shameful, morbid, lascivious, or unhealthy interest
in nudity, sex or excretion that goes substantially beyond customary limits of
candor in description or representation of sexual conduct. It is marked by restless
craving and is easily susceptible to lascivious thoughts or desires.



 The Texas statute, like that of most states, does not define "prurient interest." See
Tex. Penal Code Ann. § 43.21 (West 1994); Brokett v. Spokane Arcades, Inc., 472 U.S. 491,
505, n.13 (1985). It is unnecessary to define "prurient interest" in the court's jury charge. 
Andrews v. State, 652 S.W.2d 370, 376-77 (Tex. Crim. App. 1983); Ho v. State, 856 S.W.2d
495, 500 (Tex. App.-- Houston [1st Dist.] 1993, no pet.). When the charge submitted is a correct
statement of the law, there is no harm in refusing another requested charge. Bell v. State, 582
S.W.2d 800 (Tex. Crim. App. 1979); Philen v. State, 683 S.W.2d 440, 445 (Tex. Crim. App.
1984). The charge given defined prurient interest as an "unhealthy interest in nudity, sex, or
excretion." Logically, a healthy interest in sex is non-prurient. See Ho, 856 S.W.2d at 500. The
trial court did not err in refusing the requested charge. Appellants' sixth point of error is
overruled.

 The judgments are affirmed.



 

 Carl E. F. Dally, Justice

Before Justices Powers, Aboussie and Dally*

Affirmed on Both Causes

Filed: October 18, 1995

Publish















* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1988).
1.   This offense took place before September 1, 1994, and is governed by the law in effect
at the time the offense was committed. Penal Code, 73rd Leg., R.S., ch. 900, § 1.18, 1993
Tex. Gen. Laws 3586, 3705. Because the code amendments effective September 1, 1994, have
no substantive effect on this offense, the current code is cited for the sake of convenience.



>

The difficulty is that the argument proves too much. We are told by the Supreme
Court that obscene material is unprotected by the First Amendment, such material
being described as confined to "works which depict or describe sexual conduct." 
We can only read the recent cases as an express rejection of any argument that
pornography itself, because of its liberating impact, has for that reason alone,
serious literary, artistic, political or scientific value. We would be misreading the
message unmistakably transmitted by the Supreme Court were we to hold
otherwise.



Id. at 210. The overall educational value, if any, of exposure to pornography does not create
scientific value. Frederick F. Schauer, The Law of Obscenity, p. 147, Bureau of National Affairs,
1976. The trial court's charge followed the statute and was sufficient. Appellants' fifth point of
error is overruled.

 In their sixth point of error, appellants assert the jury charge improperly defined
"prurient interest." They argue that the jury should have been told that it could not find appellants
guilty if their program appealed only to the intended viewers' healthy interest in sex. The
definition of "prurient interest" submitted to the jury reads:



 "Prurient interest" means a shameful, morbid, lascivious, or unhealthy interest
in nudity, sex or excretion that goes substantially beyond customary limits of
candor in description or representation of sexual conduct. It is marked by restless
craving and is easily susceptible to lascivious thoughts or desires.



 The Texas statute, like that of most states, does not define "prurient interest." See
Tex. Penal Code Ann. § 43.21 (West 1994); Brokett v. Spokane Arcades, Inc., 472 U.S. 491,
505, n.13 (1985). It is unnecessary to define "prurient interest" in the court's jury charge. 
Andrews v. State, 652 S.W.2d 370, 376-77 (Tex. Crim. App. 1983); Ho v. State, 856 S.W.2d
495, 500 (Tex. App.-- Houston [1st Dist.] 1993, no pet.). When the charge submitted is a correct
statement of the law, there is no harm in refusing another requested charge. Bell v. State, 582
S.W.2d 800 (Tex. Crim. App. 1979); Philen v. State, 683 S.W.2d 440, 445 (Tex. Crim. App.
1984). The charge given defined prurient interest as an "unhealthy interest in nudity, sex, or
excretion." Logically, a healthy interest in sex is non-prurient. See Ho, 856 S.W.2d at 500. The
trial court did not err in refusing the requested charge. Appellants' sixth point of error is
overruled.

 The judgments are affirmed.



 

 Carl E. F. Dally, Justice

Before Justices Powers, Aboussie and Dally*

Affirmed on Both Causes

Filed: October 18, 1995

Publish















* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1988).
1.   This offense took place before September 1, 1994, and is governed by the law in effect
at the time the offense was committed. Penal Code, 73rd Leg., R.S., ch. 900, § 1.18, 1993
Tex. Gen. Laws 3586, 3705. Because the code amendments effective September 1, 1994, have
no subs